938 So.2d 262 (2005)
Vickie BALOUCH, Appellant
v.
STATE of Mississippi, Appellee.
No. 2003-KA-00386-COA.
Court of Appeals of Mississippi.
September 27, 2005.
Bryan C. Harbour, M. Dave Harbour, attorneys for appellant.
Office of the Attorney General by Jeffrey A. Klingfuss, attorney for the appellee.
Before KING, C.J., IRVING and BARNES, JJ.
IRVING, J., for the Court.
¶ 1. A Pike County jury convicted Vickie Balouch of illegal placement of a child for compensation in violation of Mississippi Code Annotated section 43-15-23 (Rev. 2004). She was sentenced to three years in the custody of the Mississippi Department of Corrections, with one year to *263 serve and two years on post-release supervision and fined $1,000. On appeal, Balouch argues that (1) the jury's verdict was insufficient as a matter of law, (2) the trial court erred in allowing certain testimony into evidence, (3) the trial court erred in failing to properly instruct the jury, and (4) the jury's verdict was against the overwhelming weight of the evidence.
¶ 2. We find that the State failed to present sufficient evidence that Balouch placed out a child for compensation in violation of the statute. Therefore, we reverse and render her conviction and sentence.

FACTS
¶ 3. On May 2, 2002, Balouch contacted her physician, Dr. David Smith, regarding the adoption of three-year-old Destiny Lezino. At the time, both of Destiny's biological parents were incarcerated, and Destiny had been temporarily placed in the home of her foster parents, John and Paula Newton.[1] Balouch falsely informed Dr. Smith that she had a working relationship with the Mississippi Department of Human Services (DHS) and that she worked with battered women and children. She also misrepresented that Destiny had been sexually abused by John and that Paula was addicted to drugs.[2] Later that night, Dr. Smith called Balouch to inform her that he and his wife Autumn were interested in pursing the adoption. Balouch brought the child to visit with the Smiths the next day.[3]
¶ 4. Over the course of her communications with the Smiths, Balouch also misrepresented that Destiny's father was incarcerated in a Texas prison and that he was willing to relinquish his paternal rights.[4] She also stated that she had a working relationship with local attorney Jack Price whom she recommended to handle the adoption. Balouch informed the Smiths that they could expect to pay up to $5,000 in attorney fees and expenses for the adoption. The Smiths soon learned that Destiny's father was unwilling to consent to the adoption, and Balouch was subsequently indicted for placing out a child in violation of Mississippi Code Annotated section 43-15-23 (Rev.2004).[5]

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 5. In her first assignment of error, Balouch argues that the evidence submitted by the State was insufficient to sustain her conviction. She specifically attacks the jury's finding that she requested compensation or something of value in violation of the statute.
¶ 6. When the sufficiency of evidence is challenged, the evidence is viewed and tested in a light most favorable to the State. McClain v. State, 625 So.2d 774, 778 (Miss.1993) (citing Esparaza v. State, 595 So.2d 418, 426 (Miss.1992)). "We are authorized *264 to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." McClain, 625 So.2d at 778 (citing Wetz v. State, 503 So.2d 803, 808 (Miss. 1987)).
¶ 7. We have thoroughly reviewed the record, and we find that the State failed to prove the essential elements of the crime charged. Mississippi Code Annotated section 43-15-23 (Rev.2004), which defines the term "placing out," states in pertinent part:
(1) As used in this section the term "placing out" means to arrange for the free care of a child in a family, other than that of the child's parent, stepparent, grandparent, brother, sister, uncle or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care.
(2) No person, agency, association, corporation, institution, society or other organization, except a child placement agency licensed by the Department of Public Welfare under Section 43-15-5, shall request, receive or accept any compensation or thing of value, directly or indirectly, for placing out of a child.
¶ 8. In order to secure a conviction under the statute, the State had the burden of proving that Balouch arranged to place Destiny in the Smiths' home for the purpose of free care or adoption. Although Balouch took the child to visit with the Smiths on one occasion, the record is clear that Destiny remained in her foster parents' home at all times. As a result, we fail to see how Balouch's actions constituted a "placing out" within the meaning of the statute.
¶ 9. However, assuming arguendo that Balouch illegally placed the child out, we find that there is insufficient evidence in the record to support the State's contention that she received compensation for her services. As evidence of Balouch's alleged request for compensation, the State offered as witnesses Angie McKenzie (Dr. Smith's office manager), Autumn Smith, and Dr. Smith himself.
¶ 10. McKenzie testified that Balouch first contacted her regarding the possibility of the Smiths adopting Destiny. McKenzie further testified that Balouch stated that the adoption would cost $5,000, and that "the [$5,000] would be for Jack Price to fly to Texas and for the paperwork to be done for the child to be adopted." When asked whether Balouch requested any compensation for herself, McKenzie responded, "no."
¶ 11. Next, Autumn Smith testified that Balouch suggested that Autumn Smith and Dr. Smith do a private adoption because the process would be faster than going through DHS or an adoption agency. Autumn further testified that Balouch stated that the adoption could cost them "up to $5,000," and that "the $5,000 was for Jack to fly to Texas to get the papers signed." When asked whether Balouch ever made a request for money other than the $5,000, Autumn responded, "no." Similarly, on cross-examination, Autumn offered the following testimony regarding nine pages of personal notes made by her during a discussion with Balouch about the adoption:
Q: On Page 1 of Exhibit 2. Your notes did not reflect any request of compensation or thing of value from Ms. Balouch, did they?
A: No, sir.
Q: Page 2, your notes did not reflect a request from Ms. Balouch of any money or thing of value, is that correct?
A: No, sir, did not.

*265 Q: Page 3, your notes do not reflect a request by Ms. Balouch for compensation or thing of value, do they?
A: No, sir.
Q: Page 4. Your notes do not reflect any request or statement by Ms. Balouch requesting compensation or anything of value, do they?
A: No, sir.
Q: In fact, the first four pages of your notes do not mention any type of money, funds or other thing of value, do they?
A: No, sir.
Q: Now, on page 5, your notes do say you and Ms. Balouch got into a discussion of how to go about a private adoption, didn't you?
A: Yes, sir.
Q: And you asked Ms. Balouch what was involved in going private, did you not?
A: Yes, sir.
Q: And would you give me her exact quote, please, that's in your notes?
A: I asked what was involved by going private, and Vickie then said, "it could cost up to $5,000, don't quote me on the exact price, but it could cost $5,000."
Q: And your response, according to your notes?
A: I said, `Whoa, I wasn't expecting that with the father ready to sign.'
Q: And what was her response?
A: Vickie said that we would have to pay for Jack to fly to Texas to get the papers signed.
Q: And there was no other conversation between you and Ms. Balouch about money, correct, other than what you just testified to out of your notes?
A: We talked more in discussion about the $5,000.
Q: And it was for payment to Jack for things that he was going to do?
A: She did not say that it was being given directly to Jack.
Q: What was it going to be given to?
A: She said that she  Vickie said that she helped him out as well, and that she was filling out necessary paper work, but she did not say the money was going to Jack. She just said it was for Jack.
Q: She didn't request that you give her the money, did she?
A: (No Answer.)
Q: Yes or no?
A: (No Answer.)
Q: She did not request that you give  Vickie did not request that you give her the money, did she?
A: She did not say give me the $5,000, no.
¶ 12. Dr. Smith testified that Balouch informed him that he and his wife "needed to be prepared to pay $5,000 for th[e] adoption to be able to take place." Dr. Smith stated that when he questioned Balouch about why such a large sum of money was needed, Balouch responded that "it was going to cost a lot of money for Jack Price to be able to fly to Texas . . .," and "there would be other expenses involved too . . . ." Dr. Smith testified that although he did not know exactly what the $5,000 would be used for, he assumed that some of the money would be used for Price to go to Texas.
¶ 13. The State further attempted to introduce as evidence of possible compensation a request by Balouch to Dr. Smith for a prescription refill. Although the trial judge initially sustained the defense's motion seeking to limit the State's ability to use the prescription as evidence of compensation, *266 he later ruled that the defense had opened the door to the evidence and allowed Dr. Smith to testify accordingly. On redirect examination, Dr. Smith gave the following testimony:
Q: Dr. Smith, on cross-examination, Counsel asked you the question, what thing of value would Vickie Balouch get from this adoption process, and I would ask at this time if you have an answer to that question.
A: Yes, sir. I told the jury earlier about the $5,000 issue, and I think they understand the extent of that, but the other issues that I thought were pertinent on Sunday is that on Sunday afternoon, during conversation about the child, she had asked for me to refill a prescription for some narcotic at that time that on Friday, earlier, we had denied filling because it was too early to fill, and that was routine practice.
On that Sunday night, I felt that it was appropriate to call it in because the time had expired for the previous prescription to run out, and so I did call it in. But in talking with her during that same conversation that night, Vickie told meyou know, Autumn and I were upset because we thought we were going to be able to get her that night, and we really wanted to see the child. And Vickie told me then-this is a quote  "This will be illegal, but if you want me to, I will go over to Ms. Toya's house. . ."  This is the person that doesn't exist " . . . and she'll agree" 
MR. HARBOUR [Defense counsel]: Objection to that remark. That calls for speculation. It's totally inappropriate, Judge.
THE COURT: Overruled. Proceed.
Q: Would you continue, Dr. Smith?
A: That she would go over to Ms. Toya's house and get the child and bring her to my house anyway if I just gave the word, and that's a quote. And I told her then, "No." As much as I'd like to see her tonight, I'm not going to do anything that is not appropriate, and if we're not supposed to be seeing the child and the child is supposed to be in a temporary foster home, then she needs to stay there, and we'll just have to wait until a few days have passed, and then we could get her then." And after that was said, then I started thinking that night  it was too late to call and verify anything at that time, but I started thinking then, well, this woman is trying to use  trying to get me to do something illegal that she can hold over my head and where she can continue to get narcotics inappropriately, which had been requested earlier inappropriately.
¶ 14. On recross-examination, Dr. Smith, however, testified that Balouch's prescription refill was medically appropriate, and when asked whether Balouch's offer to get Destiny had anything to do with him writing the prescription, Dr. Smith responded "no." Dr. Smith stated that he "base[d][his] decisions on writing a prescription on medicine, not on any other issue."
¶ 15. Based upon the above testimony, we find that the State clearly failed to meet its burden of proving the requisite compensation element essential to a conviction under the statute. Each of the witnesses testified that Balouch informed him/her that the $5,000 would be used for paperwork and for Price to fly to Texas and that Balouch never at any time requested compensation for herself. Similarly, it is clear from Dr. Smith's testimony *267 regarding the refill request that Balouch was not asking for the prescription as compensation or something of value in exchange for arranging the adoption. As a result, we reverse and render her conviction. In light of our disposition of the forgoing issue, we find it unnecessary to discuss Balouch's remaining issues.
¶ 16. THE JUDGMENT OF THE CIRCUIT COURT OF PIKE COUNTY IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PIKE COUNTY.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.
NOTES
[1] John Newton was formerly married to Destiny's biological mother.
[2] Balouch also told the Smiths that Destiny had been removed from the Newtons' home due to drug use by Paula.
[3] Paula was under the belief that Balouch had taken Destiny to the store and was unaware that she had actually taken the child to visit the Smiths.
[4] Destiny's father was actually incarcerated in Mississippi and was unaware of Balouch's communications with the Smiths.
[5] The grand jury returned a two-count indictment against Balouch which was later severed by the trial court. Count one charged Balouch with requesting compensation for placing out a child, and count two charged her with illegally obtaining prescription drugs in violation of Mississippi Code Annotated section 41-29-144 (Rev.2004).